IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLAYTON PADGETT, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. H-05-4151 |
| § | |
| MICHAEL J. ASTRUE, § | |
| COMMISSIONER OF THE SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| § | |
| Defendant. § | |

**MEMORANDUM AND ORDER DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment, or in the alternative, Judgment on the Pleadings and Brief in Support (Document Nos. 15 & 16), and Defendant's response to Plaintiff's motion (Document No. 19). Having considered the Plaintiff's Motion for Summary Judgment and Brief in Support, Defendant's response, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

**I.      Introduction**

Plaintiff Clayton Padgett ("Padgett") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405 (g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his

1

application for disability insurance benefits. Padgett argues that the Administrative Law Judge's ("ALJ") decision is flawed because: (1) the ALJ erred in rejecting the opinions of examining Clinical Neuropsychologists; (2) the ALJ did not properly consider the impact of Padgett's limitations on his Residual Functional Capacity ("RFC"); (3) and the ALJ erred in his assessment of Padgett's credibility. The Commissioner, in contrast, contends that there is substantial evidence in the record to support the ALJ's decision and that the decision comports with applicable law. Namely, the Commissioner asserts that the ALJ did not reject the opinions of the neuropsychologists, that the ALJ properly determined Padgett's RFC, and that the ALJ properly assessed Padgett's credibility.

## II.     Administrative Proceedings

On September 28, 2000, Padgett applied for disability insurance benefits, claiming an inability to work since January 5, 1996, as a result of organic brain syndrome with cognitive and psychological components, headaches, posttraumatic stress disorder ("PTSD"), depression, and mood swings. (Tr. 14). The Social Security Administration denied his application at the initial and reconsideration stages. After that, Padgett requested a hearing before an ALJ. The Social Security Administration granted his request and the ALJ, Jack Raines, held a hearing on January 29, 2002. (Tr. 221-238). On February 7, 2002, the ALJ issued a decision finding Padgett not disabled. (Tr. 233).

Padgett sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 404.970; 20

C.F.R. § 416.1470. After considering Padgett's contentions in light of the applicable regulations and evidence, the Appeals Council, on May 10, 2002, remanded the case to the hearing office. (Tr. 14). Following a hearing on February 20, 2003, the ALJ, Gerald Meyer, on March 13, 2003, issued a decision finding Padgett not disabled.

Padgett again sought review of the ALJ's decision with the Appeals Council. In an order dated November 28, 2003, the Appeals Council again remanded the case for further hearing by the ALJ. (Tr. 287). A third hearing was held on October 6, 2004. (Tr. 375). On December 8, 2004, the ALJ, Gerald Meyer, again found that Padgett was not disabled because he retained the RFC to perform a significant number of jobs in the national economy. (Tr. 20). Padgett filed another request for review with the Appeals Council. On October 14, 2005, the Appeals Council denied Padgett's request for review, and the ALJ's December 8, 2004 decision thus became final.

Padgett filed a timely appeal of the ALJ's decision. Padgett then filed a Motion for Summary Judgment and Brief in Support (Document Nos. 15 & 16). The Commissioner filed a reply to Padgett's Motion for Summary Judgment. (Document No. 19). This appeal is now ripe for ruling.

### III.     Standard of Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of

Social Security, with or without remanding the case for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co., v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

**IV.    Burden of Proof**

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson*, 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to decide disability status:
>
> 1. If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe impairment" or combination of impairments, [he] will not be found disabled;
>
> 3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Legget v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *Id.* Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Legget*, 67 F.3d at 564**.**

Here, the ALJ determined that Padgett was not disabled at step five. In particular, the ALJ determined that Padgett was not presently working (step one); that Padgett's anxiety, depression, possible organic mental disorder and PTSD were severe impairments (step two); that these conditions, when considered both singly and in combination, did not meet or equal an impairment listed in Appendix 1 of the regulations (step three); that Padgett's impairments precluded him from doing his past work (step four); and that Padgett's impairments did not prevent him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and RFC (step five). In this appeal, the Court must determine whether substantial evidence supports that step five finding, and whether the ALJ used the correct legal standards in arriving at that conclusion, including, whether the ALJ improperly rejected opinions of examining neuropsychologists, whether the ALJ properly considered Padgett's limitations in assessing his RFC, and whether the ALJ's assessment of Padgett's credibility was proper.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the

plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V.     Discussion

### A. Objective Medical Facts

The objective medical evidence shows that Padgett suffers from PTSD, a possible organic mental disorder, depression, and anxiety.

Padgett's conditions arose in 1996 out of a work accident in which he was exposed to a cloud believed to be made of an unspecified chemical vapor (most likely ethylene dichloride). Padgett has since complained of headaches, nausea, dizziness, and sensitivity to smells.

In late 1996 Padgett underwent an EEG because of the headaches and dizziness. The results of this suggested a mild generalized encephalopathy. (Tr. 103). The same test showed no electrographic evidence of a focal cerebral lesion and there were no epileptic findings. In February of 1997 neurologist Dr. Victor Rivera reported that Padgett's neurological examination was normal. No specific treatment was offered at that time. (Tr. 105).

Padgett received a neuropsychological evaluation from Dr. Robert Borda in May of 1997. Padgett reported persistent problems since the incident, including altered sense of taste and smell, loss of appetite, increased sensitivity to chemical odors, almost constant headaches, episodic dizziness, and episodes of transient blindness. (Tr. 106). Padgett also complained of reduced memory, slowed reaction times, and moodiness. *Id.* Dr. Borda administered a series of tests which revealed functioning in the borderline to low average range of intelligence. (Tr. 108).  Padgett's recognition vocabulary fell at the lower limit of the average range. He was found to have below

average word generating skills but no gross deficits in expressive or receptive speech were noted in conversation. Padgett was found to have quite poor mental tracking abilities and marked cognitive slowing. The tests showed defects in visuospatial reasoning and impaired cognitive processing. Dr. Borda's report noted that Padgett's deficits suggest diffuse cerebral dysfunction and are compatible with an encephalopathic process. The testing also suggested that Padgett was suffering from depression, the affective factors of which may have contributed to the severity of the cognitive defects. (Tr. 109). Padgett was diagnosed with adjustment disorder with depressed mood and cognitive disorder related to toxic exposure. *Id.*

Padgett underwent an MRI scan of the brain on November 11, 1996, which yielded normal results. (Tr.116). Likewise, a brain SPECT scan administered on October 20, 1999, found no abnormalities. (Tr. 115).

On December 9, 1997, Dr. Rivera referred Padgett to psychologist Dr. James Ezelle for psychological treatment. (Tr. 125). Dr. Ezelle began treating Padgett on December 19, 1997. Padgett was prescribed Paxil for depression, which was soon changed to Zoloft. By the end of January, 1998, some of Padgett's depression related symptoms were getting better, though he continued to complain of headaches and anxiety. Dr. Ezelle prescribed Busbar for the anxiety on February 19, 1998. Further improvement was noted on March 19, 1998, but Padgett continued to complain of physical symptoms including sensitivity to odors, tingling and numbness, headaches, and dizziness. On May 14, 1998, Dr. Ezelle prescribed Mellaril to try to help the headaches, though it proved ineffective and was soon discontinued by Padgett. (Tr. 178-80). Padgett continued seeing Dr. Ezelle through at least October of 2000, but it appears that his condition had stabilized by the middle of 1998. At least some of Padgett's physical symptoms continued to bother him (headaches in particular), but the mental

symptoms were eased by Zoloft and Busbar. (Tr. 182).

On January 31, 2001, Padgett saw consulting internist, Dr. Ron Gentry. Dr. Gentry reported having difficulty maintaining Padgett's attention and that Padgett had difficulty focusing on one point. Dr. Gentry reported that Padgett's activities were limited mostly by anhedonia, but also mentioned the headaches and sensitivity to smell. Otherwise, the physical examination was within normal limits. (Tr. 187)

On October 19, 2001, Padgett had a neuropsychological evaluation with Dr. David McLendon.(Tr. 198). Dr. McLendon opined that there is a high probability that Padgett sustained brain dysfunction and, because of the brain dysfunction, has problems related to cognitive functioning. (Tr. 202). The evaluation recommended long-term treatment for Padgett's depression and cognitive problems, but said that Padgett should be able to return to work in some area with help finding appropriate areas of employment.

From November 26, 2001 through November 30, 2001, Padgett underwent a functional capacity evaluation administered by Dr. Larry Pollock. (Tr. 206). A series of tests revealed a below average level of auditory vocabulary comprehension and a below average level of nonverbal reasoning and visual problem solving skills. Padgett demonstrated a good ability to work with concrete objects and solve a visual problem on the Mechanical Aptitude Work Sample. (Tr. 209). The Shipping and Receiving Work Sample revealed above average quality of work and average rate of performance. *Id*. Another test revealed that Padgett was able to perform tasks involving the dexterous use of hands but a below average ability to study and learn new information. (Tr. 210). The report said Padgett had excellent attention to detail, with no errors on the Filing Work Sample. *Id*. The report noted that Padgett has an above average ability to follow verbal instructions, good

9

performance on clerical work samples, and good hands-on mechanical aptitude. The report also noted that Padgett has below average scholastic aptitude, poor attention to detail, poor performance with nonverbal tasks, difficulty studying and remembering new information, poor interpersonal skills, and below average nonverbal problem solving skills. (Tr. 210-11). The report recommended that Padgett participate in a cognitive rehabilitation program and job development services as well as psychotherapy for his emotional problems. (Tr. 211-12). The report closed by suggesting jobs that "appear to be within [Padgett's] vocational potential once the above recommendations have been successfully completed," including general hardware salesperson, gate guard, and punch press operator. (Tr. 212).

Padgett was evaluated by a psychiatrist, Dr. Jasmin Erlichman, one time on February 18, 2004. (Tr. 357). Dr. Elrichman was unable to complete her interview since Padgett began crying during the interview. Padgett was diagnosed with PTSD, major depression, and generalized anxiety. Dr. Elrichman opined that these conditions resulted from the chemical exposure. Dr. Elrichman said she believed that Padgett's treatment regime was medically reasonable and necessary and recommended that it be continued. (Tr. 359).

In a letter dated January 4, 2004, Dr. Ezelle, Padgett's treating psychiatrist, wrote that Padgett had been under his care since 1997 and that such care is necessary to lessen his symptoms of anxiety, depression, and PTSD. Dr. Ezelle wrote that Padgett had been psychiatrically stable with quarterly checkups and the medications (Zoloft and Busbar.)

Having examined the objective medical evidence in the record, it is clear that Padgett suffers from PTSD, depression, and anxiety. The evidence also shows that Padgett suffers from headaches, but the ALJ found that condition not to be severe and that finding is not challenged on this appeal.

There is also objective medical evidence to support a finding of encephalopathy, which affected Padgett's cognitive abilities. However, none of the objective medical facts are sufficient to establish that Padgett is disabled as defined by the Act. Therefore, the objective medical evidence factor supports the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

There are several expert medical opinions on the record, including the opinions of Padgett's treating neurologist, Dr. Rivera, his treating psychologist, Dr. Ezelle, the medical expert who testified at the hearing, and multiple physicians who consultatively examined Padgett. The ALJ discussed the opinions of all of these physicians in his decision. Contrary to Padgett's assertions, the ALJ did not reject the opinions of the examining neuropsychologists Dr. Borda, Dr. McLendon, or Dr. Pollock. (Document No. 14 at 4). Each of these psychologists discussed Padgett's cognitive defects but none of them reported that Padgett could not work. (Tr. 106-09, 204, 211-12).

While Dr. Borda did report a pattern of deficits suggestive of relatively diffuse cerebral dysfunction that would be compatible with an encephalopathic process (Tr. 109), Dr. Rivera, Padgett's treating neurologist, reported that Padgett's neurological examination was normal, despite encephalopathic features showing up on his EEG. (Tr. 105). As the case law establishes, it is not error for the ALJ to give greater weight to a treating physician over an examining physician. Further, both Dr. McLendon and Dr. Pollock, in his functional capacity evaluation of Padgett, explicitly stated that Padgett could work, but may need assistance in finding appropriate employment. (Tr. 204, 212). As such, Padgett's argument that the ALJ improperly rejected the opinions of the examining neuropsychologists is misplaced.

The ALJ's decision is not inconsistent with Dr. Pollock's opinion that Padgett was not a good candidate for a formal vocational training program. In the context of the report, it seems that Dr. Pollock was referring to the listed "skilled" occupations, which he believed would be the most appropriate vocational options for Padgett. (Tr. 211). While Dr. Pollock did opine that Padgett's low scholastic aptitude and reading skills made him a poor candidate for such a training program, the ALJ, in listing jobs that Padgett could perform, mentioned only unskilled activities, for which no formal vocational training is necessary. (Tr. 20). In finding number nine, the ALJ listed jobs that Padgett "is capable of performing including: (1) machine packager: (medium *unskilled* 3000 regionally, 100,000 nationally), (2) bench assembler: (light *unskilled* 2000 regionally, 100,000 nationally), (3) final assembler: (sedentary *unskilled* 1,000-2000 regionally, 100,000 nationally)." (Tr. 21) (emphasis added). Since the ALJ found that Padgett was capable of performing only unskilled jobs for which no formal training is necessary, the fact that he may not be able to participate in vocational training has little impact on whether Padgett is disabled as defined by the

Act.

Dr. Ezelle, Padgett's treating psychiatrist, reported on January 26, 2001, that Padgett seemed to be stable on his medication regime consisting of Zoloft and Busbar. (Tr. 176). This was Dr. Ezelle's second to last progress report on Padgett before his insured status under the Act expired on September 30, 2001. Dr. Ezelle repeated the report of a stabilized mental state on August 21, 2002 (Tr. 351) and October 15, 2003. (Tr. 367-68). The fact that the medication stabilized some of Padgett's conditions weighs in favor of the ALJ's determination that Padgett is not disabled.

At the hearing, a medical expert, Dr. Lazar, testified based on his evaluation of the medical evidence in the record. (Tr. 375-80). The questioning of Dr. Lazar focused on the functional capacity evaluation done by Dr. Pollock. During the hearing Dr. Lazar discussed the functional evaluation: "as Dr. Pollack said in his vocational evaluation, that the areas he could be working are the skilled outdoor and technology and service occupations, but they are contingent upon participation in some cognitive rehabilitation therapy." (Tr. 377). Upon cross examination, Dr. Lazar went on to say of Dr. Pollock's report, "the final conclusion is pointing towards an ability to sustain some employment." (Tr. 377-78). The issue of the rehabilitative therapy program was brought up again by Padgett's attorney while questioning Dr. Lazar:

> Q: Let me make sure that I understand how you are interpreting [Dr. Pollock's report]. My understanding of what you're saying is your interpretation is that he could participate in a program, correct?
>
> A: My interpretation is that he has the potential to perform these jobs but it is contingent upon participating in a therapy, re-application or rehabilitative therapy first.
>
> Q: So, essentially, what you're saying, until he participates in psychotherapy and the other programs that they mentioned, they are essentially saying that they are not going to put him in a formal vocational training program?

A: That's correct. That's correct.

(Tr. 379). From his testimony, it appears that Dr. Lazar considers Padgett's condition remediable. "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). There is nothing in the record to indicate that Padgett is, for any reason, unable to participate in the therapeutic and rehabilitative treatments the evaluation and Dr. Lazar recommended. Thus, Padgett's argument that the ALJ erroneously left out the opinion that Padgett would not be accepted into job training because he was determined to not be a good candidate does not warrant disturbing the decision of the ALJ. (Document No. 15 at 8). As discussed above, it is particularly relevant that Dr. Pollock was referring to skilled jobs when discussing the training program. (Tr. 211.) This has little bearing on whether Padgett could perform the unskilled jobs that the ALJ found Padgett was capable of performing. Because the ALJ properly considered the opinions of Padgett's treating and examining physicians, this factor weighs in favor of the ALJ's decision.

### C. Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause the pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably

consistent with the objective medical evidence of the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment,'" *Sellers*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Padgett testified at his hearing before the ALJ only briefly. Padgett answered questions about his education and the fact that he has not worked since 1996, but when asked to recount the accident of January 1996, he began to cry and had to step down from the stand. (Tr. 380-82). After that Padgett's mother testified. She discussed her son's increased sensitivity to smells, moodiness, and difficulty thinking. (382-83). She noted that her son has always worked but now spends most of his time sitting around watching TV and biting his fingernails. (Tr. 383).

The ALJ found that Padgett's testimony was exaggerated and that Padgett was not credible. In doing so, the ALJ wrote:

> In making the preceding residual functional capacity assessment, an evaluation of all symptoms including pain has been made under 20 C.F.R. 404.1529 and SSR 96-7p, taking into account all relevant factors including: (1) the nature, location, onset duration, frequency, radiation and intensity of any pain; (2) precipitating and aggravating factors; (3) type, dosage, effectiveness and side effects of medication; (4) treatment for relief of pain; (5) functional limitations; and (6) restrictions upon daily activities.... The general facts and dates claimant related during his testimony appeared to be consistent with the record and are generally credited; however, claimant exaggerated some of his symptoms and restrictions. I noted that claimant remained alert and aware of everything that occurred during the hearing. While he

>did not testify for any length of time, his speech was intelligible he was very articulate, logical, and coherent. He certainly did not evidence problems with interactions that were of a severity such as that he alleged. Additionally, he has a girlfriend he lives with her some times [sic] and sometimes he resides with his mother. He has a truck and is able to drive where he has to go. Claimant has not sought any kind of work since 1996 without a real clear reason. He also has not sought out any job training program.

(Tr. 19). Credibility determinations, such as that made by the ALJ in this case in connection with Padgett's subjective complaints of pain, are generally within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert denied*, 514 U.S. 1120 (1995). Because the record shows that the ALJ made and supported his credibility determination, and because the ALJ did not rely on any inappropriate factors in making his credibility determination, this factor also weighs in favor of the ALJ's decision.

### D. Education, Work History, and Age

The fourth element considered is the claimant's educational background, work history and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

As of the date of the last administrative hearing, Padgett was 42 years old, had a GED education, and had past work experience as a construction rigger. (Tr. 389). Based on his determination of Padgett's residual functional capacity, the ALJ posed a hypothetical to a vocational

expert ("VE") about Padgett's ability to engage in his past work and other work:

> ALJ: Would you assume an individual who mentally is limited to simple one and two step plans; no abstract; the work should have a moderate pace; limited contact with public; no exposure to outside weather conditions; no extreme heat; no exposure to fumes, noxious odors, dust, mists, gases, poor ventilation; should be permitted to wear surgical mask or something similar to that while working; could such an individual do the past work you described [a rigger]?
>
> VE: No
>
> ALJ: Would there be any other work in the U.S. economy for a person who is 42 years old with a GED and the past work as you described?
>
> VE: Yes, sir, that hypothetical is compatible with most of the jobs commonly noted by the commission in the unskilled range from medium to light, sedentary. I'd reduce the overall base on the totality of your hypothetical by about 25 percent.
>
> ALJ: Could you give me just a couple of examples?
>
> VE: Yes, sir. Machine packager, that's medium and unskilled; bench assembler, that's light and unskilled; telephone, no, vinyl assembler, that's sedentary and unskilled.

(Tr. 389-90). Padgett's attorney then posed another hypothetical to the vocational expert. Using the same hypothetical posed by the ALJ, Padgett's attorney also included that "the individual experiences severe headaches which could potentially interfere with his ability to maintain a schedule." (Tr. 390). The vocational expert said that this could have a significant affect on the ability of an individual to be retained in a job. *Id*. However, since the ALJ properly found that the headaches were not in fact a severe impairment and that Padgett had exaggerated some of the restrictions imposed by his conditions, it was not error for the ALJ to rely on the vocational expert's response to his original hypothetical. Because the ALJ properly considered Padgett's education, age, and work

17

history in determining what other jobs in the national economy Padgett could perform, this factor also supports the decision of the ALJ that Padgett was not disabled.

### VI.     Conclusion and Order

Considering the record as a whole, it is the opinion of this court that the ALJ properly used the guidelines propounded by the Social Security Administration, which directs a finding of "not disabled" on these facts. *See Rivers v. Schweiker*, 684 F.2d 1144 (5th Cir. 1982). As all the relevant factors weigh in support of the ALJ's decision, and as the ALJ used the correct legal standards, the Court

ORDERS that Plaintiff's Motion for Summary Judgement (Documents No. 15 & 16) is DENIED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this 22nd day of June, 2007.

Frances H. Stacy
United States Magistrate Judge

19